THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JULIO RAMIREZ PEREZ, Appellant.

Reargued October 4, 1949; decided December 29, 1949.

*Rose Rothenberg, James D. C. Murray, Abraham J. Gellinoff* and *Joseph J. Cella* for appellant. I. The confession was illegally extorted from defendant by force and threats, and its admission in evidence contravened section 395 of the Code of Criminal Procedure and the due process clauses of the State and Federal Constitutions. (*Malinski* v. *New York,* 324 U. S. 401; *People* v. *Valletutti,* 297 N. Y. 226; *Ashcraft* v. *Tennessee,* 322 U. S. 143; *Haley* v. *Ohio,* 332 U. S. 596; *People* v. *Barbato,* 254 N. Y. 170; *People* v. *Weiner,* 248 N. Y. 118; *People* v. *Mummiani,* 258 N. Y. 394.) II. Apart from the elements of force and threats, the prolonged secret inquisition to which defendant was subjected was a denial of the due process of law protected by the Fourteenth Amendment of the United States Constitution and rendered the confession inadmissible in evidence. (*Haley* v. *Ohio,* 332 U. S. 596; *Ashcraft* v. *Tennessee,* 322 U. S. 143.) III. It was prejudicial error for the trial court (a) to refuse defendant's requested charge that the jury could not convict him if it found that the confession was involuntary, and (b) to leave the jury free to convict defendant of felony murder merely on the basis of his possession of some of the stolen property. (*People* v. *Galbo,* 218 N. Y. 283; *People* v. *Taddio,* 292 N. Y. 488; *People* v. *Weiss,* 290 N. Y. 160; *People* v. *Bearden,* 290 N. Y. 478.) IV. It was prejudicial error for the trial court to refuse to charge the jury that it could take into account any unnecessary delay in the arraignment of defendant in determining whether the confession was voluntary. (*People* v. *Alex,* 265 N. Y. 192; *People* v. *Elmore,* 277 N. Y. 397; *People* v. *Malinski,* 292 N. Y. 360, 324 U. S. 401; *People* v. *Mummiani,* 258 N. Y. 394; *People* v. *John Doe (Bernoff),* 261 App. Div. 504; *Matter of Prestigiacomo,* 234 App. Div. 300; *People ex rel. La Tempa* v. *Hughes,* 182 Misc. 1078.) V. The confession was illegally extorted from defendant by force and threats. VI. Apart from the elements of force and threats, the prolonged secret police interrogation of defendant by relays of thirteen different police officers was a denial of due process and vitiated the confession. (*Watts* v. *Indiana,* 338 U. S. 49; *Harris* v. *South Carolina,* 338 U. S. 68; *Turner* v. *Pennsylvania,* 338 U. S. 62; *People* v. *Mummiani,* 258 N. Y. 394; *People ex rel. La Tempa* v. *Hughes,* 182 Misc. 1078; *People* v. *McLaughlin,* 291 N. Y. 480.)

*Frank S. Hogan, District Attorney* (*Whitman Knapp* and *Peyton H. Moss* of counsel), for respondent. I. Defendant's confession was voluntarily given and his guilt established beyond a reasonable doubt. II. The court's refusals to charge were proper. (*Wilson* v. *United States,* 162 U. S. 613; *Denny* v. *United States,* 151 F. 2d 828, 327 U. S. 777; *Lindsay* v. *People,* 63 N. Y. 143; *Williams* v. *Commonwealth,* 29 Pa. 102; *People* v. *Galbo,* 218 N. Y. 283.) III. The confession was properly received in evidence. (*Watts* v. *Indiana,* 338 U. S. 49; *Turner* v. *Pennsylvania,* 338 U. S. 62; *Harris* v. *South Carolina,* 338 U. S. 68; *People ex rel. Rao* v. *Adams,* 296 N. Y. 231; *People ex rel. Ditchik* v. *Sheriff of County of Kings,* 171 Misc. 248, 256 App. Div. 1081; *People ex rel. Nuccio* v. *Warden,* 182 Misc. 654; *Lisenba* v. *California,* 314 U. S. 219; *McNabb* v. *United States,* 142 F. 2d 904, 323 U. S. 771.)

BROMLEY, J. Defendant has been sentenced to death, after conviction for the murder of Vera Lotito in New York City on March 30, 1948. The case was submitted to the jury upon the theory that the deed was done while defendant was engaged in committing a felony, either burglary or robbery.

At about 5:30 P.M. on Tuesday, March 30, 1948, Vera Lotito's husband found her dead, but still warm, body lying on the floor of the living room of their walkup apartment on the third floor of 144 East 55th Street. The apartment had been burglarized. The body was lying face down, with legs tied at the ankles and hands bound behind the back by neckties. A necktie was also knotted around the throat and another tie was passed through the mouth and wrapped twice around the neck. An autopsy disclosed fifteen stab wounds which could have been caused by a screw driver, four of the wounds having penetrated the heart or other vital organs. The cause of the death was strangulation and stab wounds.

The cylindrical lock of the apartment door had been pried out. Among other things missing from the apartment were one large black and one tan suitcase, suits of men's clothes, a fountain pen bearing the name of deceased's husband, a billfold and a set of papers addressed to him, a bathroom scale, jewelry and clothing belonging to deceased, including her diamond wrist watch, her engagement and wedding rings — worn by her on the day of the killing — and a woman's raccoon coat.

At the trial it was established that two of Mr. Lotito's suits had been pawned by a young man with a Spanish accent in the afternoon of March 30th; and later on that day the same person had returned and pledged a lady's diamond wrist watch. Friday, April 2d, at noon, defendant entered a pawnshop at 9 Columbus Avenue, laid Mrs. Lotito's raccoon coat on the counter and talked to one of the clerk's about pledging it or securing extra fur for lengthening it. Defendant became suspicious during the conversation and left the shop with the coat. The shop was being watched by a detective who followed defendant down the street. The latter was joined by his uncle, but they parted outside of a tenement house on Ninth Avenue. The detective followed defendant into the vestibule of that house, where he identified himself and attempted to arrest defendant. The detective testified that the defendant resisted and a fight ensued in which heavy blows and kicks were exchanged, the detective finally beating defendant around the head and face with a blackjack. The detective finally drew his gun and ordered defendant to the street. The latter did not obey, and at this point one Braverman, a pawnbroker, and his son, a professional boxer, appeared and a further struggle ensued during which the boxer hit defendant and heaved him against the wall. Defendant was subdued and taken to the East 51st Street police station, where the raccoon coat was identified as belonging to deceased and the stolen fountain pen bearing the name of deceased's husband was found on defendant.

Shortly after his arrest, on Friday, April 2d, defendant admitted that on the afternoon of the killing he had pledged other articles at various pawnshops in the neighborhood. The police thereupon recovered from those shops much of the stolen property. On the morning of April 3d, defendant's uncle and cousin, Frank and Willie Perez, were questioned, and the police recovered from Frank the other missing suitcase with the rest of the stolen property that defendant had given to Frank upon either March 31st or April 1st, asking him to hide it. Several days later the police also recovered from Frank a screwdriver which had been wrapped in brown paper and left with him by defendant.

Following his arrest, defendant first explained his possession of deceased's property immediately after the killing by saying

that a stranger had given him the raccoon coat and the fountain pen to sell. When a police officer left to check the story, defendant withdrew it and stated that he had received the coat from a friend named Danny Miles, who had appeared at his apartment with two suitcases.

Late on the afternoon of the day of his arrest one Earl Cox, the superintendent of 144 East 55th Street, where the homicide was committed, was brought to the police station and defendant identified him as Danny Miles. During the evening of the day of his arrest defendant said he had met Cox in a Second Avenue barroom. About midnight, after having been taken to the barroom where the bartender stated that he had never before seen defendant, defendant admitted that the story about Cox was untrue. Defendant then claimed that Danny Miles was a person he had met near the Seamen's Institute and that Miles lived at the YMCA on West 63rd Street. At about 4:30 A.M. on Saturday, April 3d, defendant was taken to the latter place, but no one recognized him nor could anyone identify Danny Miles as described by defendant. Defendant was then returned to the police station and later on that morning taken downtown near the Seamen's Institute in a further fruitless search for Miles.

At noon on Saturday, April 3d, defendant was brought before a General Sessions Judge and committed to city prison as a material witness in default of $50,000 bail. At the hearing defendant raised the question of his right to counsel and at his request a lawyer representing the Legal Aid Society was assigned to look after his interests. After being told by the assistant district attorney that he was entitled to write or telephone to the Legal Aid Society, he was lodged in city prison about 12:15 P.M.

It is clear that for the period of twenty-four hours between the arrest and commitment as a material witness defendant was questioned almost continually by as many as thirteen detectives, exclusive of the assistant district attorney. At the trial he testified that he was beaten and brutally abused during the entire twenty-four hours that elapsed between his arrest and his commitment as a material witness. This testimony was denied by the accused police officers at the trial, and it appeared that defendant made no complaint of assault or abuse to the committing judge upon arraignment. He was given a medical examination

upon his arrival at city prison which disclosed lacerations and bruises all of which could have been accounted for by his resistance at the time of arrest, the fact of which he readily admitted to the doctor. It is undisputed that he neither confessed nor made any self-incriminating statement during the twenty-four hours in question.

After his commitment as a material witness defendant was left in the city prison from Saturday noon until early Monday afternoon, April 5th. At the trial he testified that after he was lodged in city prison as a material witness he asked to see a Legal Aid Society lawyer but was informed by a police captain that he was being held incommunicado and was not allowed to write or receive letters or visitors and that the District Attorney's office had forbidden all communications or visitors. The police captain referred to was not questioned about and did not deny this accusation, although he was called as a witness by the defense and testified that a person held as a material witness was entitled to have counsel if he so desired. Defendant did not again ask for a lawyer and did not see one until after his arraignment upon a homicide charge on April 9th. During this interval of time he mingled freely with persons held on other than criminal charges in the special section of the prison reserved for that purpose, spoke almost daily with the assistant district attorney, who had also advised him of his right to counsel, and saw his wife and various friends and relatives who knew that he was in custody.

The questioning of defendant was resumed early Monday afternoon, April 5th. During the next four days, and until his arraignment on April 9th on a charge of first degree murder, the defendant was questioned repeatedly and finally confessed, giving a question and answer statement to an assistant district attorney from 11:37 P.M., April 8th to 1:56 A.M., April 9th. Out of the seventy-six hours which preceded this confession defendant was questioned intermittently for a total of thirty-two hours. He was brought from the prison to the District Attorney's office in the early afternoon of Monday, April 5th, and his questioning lasted until 3:15 A.M., Tuesday, April 6th. During this period he abandoned his story about Danny Miles and, asserting that he was now going to tell the truth, accused his cousin Willie of the killing. He explained in detail how he

accompanied Willie to 144 East 55th Street, waited outside while the latter robbed the apartment, and helped Willie carry the suitcases to defendant's home. When questioned Willie denied the accusation.

Defendant remained in the prison until 2:30 p.m. on the afternoon of April 6th when he was again brought to the District Attorney's office. Throughout the day he continued to accuse Willie of the killing and was returned to the prison about 11:00 p.m. Defendant was not questioned on Wednesday, April 7th. He was brought to the District Attorney's office about 11:00 a.m. on Thursday, April 8th, and was again questioned. Early in the evening he was confronted with his second wife, who pleaded with him to tell the truth, and he thereafter broke down, wept and confessed. He first informally described the killing, giving an oral statement, and after adjournment for dinner a stenographer was secured and the taking of a formal statement was commenced at 11:37 p.m.

Defendant testified at the trial in lurid language to a continuous series of beatings by the police during much of the time which preceded his arraignment as a defendant. He testified that at the time of his confession his right eye was swollen shut. The assaults, he said, had taken place in the absence of the District Attorney, but he made no complaint because he feared reprisals. Defendant claimed, further, that Cox and his cousin Willie were also beaten, and that his false accusations against them were made in order to secure a respite for himself. Cox contradicted defendant's story that the police beat and abused Cox and testified that defendant was not beaten or mistreated in any way in Cox's presence.

Defendant asserted that his clothing was stripped from him and never returned, and that all of the time he was in the custody of the police, except for two drinks of water, he was denied food, drink and cigarettes. He identified the various detectives whom he accused of being perpetrators of the deeds. All such persons denied the accusations.

Finally defendant maintained that he had known nothing of the details of the crime until told them by a police officer, who acquainted him with the autopsy and rehearsed him in his confession in great detail, after which he recited it to the District Attorney. He further claimed that the trip to the scene

of the crime and its re-enactment after his confession, were directed entirely by the District Attorney and the detectives, who decided upon the route and told him what to do. This was was all denied.

There are in the record four photographs of defendant taken shortly after the signing of his confession on the morning of April 9th. They show an unmarked, alert, neatly dressed and groomed man, and completely belie his assertion of an eye swollen shut and cuts and abrasions on his face. One of the photographs, taken by a newspaper photographer immediately after his confession was made, shows the defendant in a smiling and completely self-possessed pose.

Defendant took the stand in his own defense, admitted that he had in his possession articles belonging to the deceased and that he had pawned some of them, repudiated his confession, and denied that he had ever been in the deceased's apartment or that he had killed her.

On this appeal, defendant contends that the confession was extorted by force and threats, and that its admission in evidence therefore violated section 395 of the Code of Criminal Procedure and the due process clauses of the State and Federal Constitutions. Whether the confession was voluntary or had been extorted by force was the subject of conflicting testimony. All of the evidence offered on that issue was admitted by the trial court, and the question was submitted to the jury with instructions which were proper. The jury has concluded that the confession was voluntary. Upon the record it is clear that they were justified in so finding (*People v. Roach,* 215 N. Y. 592). As Judge Desmond said in *People v. Valletutti* (297 N. Y. 226, 231), '' If there is a fair question of fact as to this [extortion of confession], the jury's verdict is not interfered with.'' In the *Valletutti* case there had been evidence of wounds suffered by the accused while in custody, reasonably attributable only to the assaults which, the defendant testified, had been committed upon him by the police. Those wounds were unexplained by the People. In the instant case, however, the People have an explanation for the physical condition of the defendant upon the first medical examination: the struggle at the time of defendant's arrest. Moreover, the picture of defendant taken by a newspaper photographer immediately

after the confession was evidence which in itself might have convinced the jury that there was nothing to defendant's stories of assault and abuse.

Defendant also contends that the prolonged interrogation to which he had been subjected, apart from the controverted elements of force and violence, rendered his confession inadmissible and constituted a denial of due process of law under the Fourteenth Amendment of the Federal Constitution. We ordered reargument on this point so that we might consider the effect of three recent decisions of the Supreme Court of the United States (*Watts* v. *Indiana,* 338 U. S. 49; *Turner* v. *Pennsylvania,* 338 U. S. 62; *Harris* v. *South Carolina,* 338 U. S. 68). In those cases the Supreme Court reversed convictions for murder which were based upon confessions obtained while the defendants were detained by the police without judicial hearing and after they had been subjected to persistent police interrogation. In the *Watts* and *Turner* cases the detentions had violated statutes commanding the prompt arraignment of those detained by the police. In each case the cumulative effect of prolonged interrogation by relays of questioners, the defendant's detention without preliminary hearing or advice as to his rights, and without opportunity to consult family, friend or counsel, compelled the conclusion that the confession had been extorted without due process of law.

Unless those decisions bar any lengthy questioning of one who possesses information about a crime, while he is in the custody of the prosecuting authorities, they are not controlling here, for the other elements of unlawful coercion there condemned are not found in this case. After his arrest Perez indicated that he knew, or might help to ascertain, the killer. There was ample reason for continued questioning and in view of defendant's series of falsehoods and false clues there was ample reason for its prolongation. He was properly committed as a material witness after hearing and his subsequent detention was lawful. At that hearing, which took place within twenty-four hours of his arrest, defendant was informed of his right to counsel. Accepting his testimony that a prison official later denied him permission to communicate with a lawyer, we cannot say that he was barred legal assistance when he never

renewed that request to the assistant district attorney or to members of his family whom he saw frequently in the following days. Under those circumstances we cannot accept defendant's contention that his interrogation violated the due process clause.

The trial court refused defendant's request to charge that the jury might not convict him if it found the confession involuntary. The court's ruling rested upon the other evidence of defendant's guilt, which it held sufficient to justify conviction of felony murder. That other evidence is the testimony that the body of the victim was found about 5:23 P.M. on March 30th; that when her husband left that morning the deceased wore her wedding and engagement rings; that, on the same afternoon, defendant had in his possession those rings and other property stolen from the apartment; that defendant possessed, and hid, a screw driver which could have caused the wounds and that he falsely accused Willie Perez of the crime. Apart from defendant's confession, that evidence, considered in light of his series of inconsistent stories after arrest, would have justified a finding of guilt. Since this evidence was not completely assembled until shortly before the confession, this conclusion does not militate against our determination that there was no undue delay in arraignment.

Defendant also challenges the court's refusal to charge that the jury might consider his detention in the station house and in the District Attorney's office any unnecessary delay in arraignment, and all circumstances surrounding the taking of the confession, in determining whether it was voluntary. Since the court had covered all the circumstances relating to the confession save the fact of defendant's detention and the interval between his arrest and arraignment on a murder charge, only those latter portions of the request present a question on this issue. If the jury might have found that defendant was held until April 9th in violation of section 165 of the Code of Criminal Procedure, the charge should have been given (*People* v. *Mummiani*, 258 N. Y. 394). Such an inference was not permissible. While the police may have suspected defendant of the murder, they did not have enough evidence to hold him as a defendant until shortly before he confessed. His detention during this period was lawful because, in light of his

admitted knowledge of many of the circumstances surrounding the murder, his commitment as a material witness was valid.

Defendant was held as a witness within twenty-four hours of his apprehension with some of the stolen property, the intervening period having been consumed by questioning, recovering more property and checking defendant's various stories. He made no confession until five and one-half days later and was promptly arraigned thereafter. Assuming that the twenty-four hours' delay in taking defendant before the Court of General Sessions for commitment should be deemed unnecessary, that delay could not have been an efficient cause of the confession. It is suggested that the commitment as a material witness was a mere pretext for holding defendant. But the jury could not have so found. Certainly at the time of the commitment there was ample reason to hold him as a witness, and the police then did not have sufficient information to arraign him upon a murder charge. Although the trial court held that there was sufficient evidence to warrant conviction apart from the confession, much of that evidence was not known to the police at the time of the commitment, and it was not all known until shortly before the arraignment, because of the conflicting and false stories told by defendant up to the time of his confession.

If the prosecuting authorities had enough information to arraign Perez for murder on April 3d, but procured his commitment as a material witness so as to continue an interrogation which would have been hampered by arraignment, that commitment should have been considered but a pretense to enable the surreptitious violation of the prompt arraignment statute. In that event defendant would have been entitled to the charge requested. Since the jury could not have found the commitment unjustified, or a mere pretense, on the information then in possession of the authorities, the court properly refused the charge.

The judgment of conviction should be affirmed.

DESMOND, J. (dissenting). Defendant, after his arrest, was held by the police for about twenty-four hours before he was committed to jail (in default of very high bail) as a material witness. Then he was held for five days more before he finally confessed, and only then was he arraigned before a Magistrate.

It is admitted that, during those periods, he was questioned for hours at a time, by a great variety of policemen, and by an assistant district attorney. Defendant says that he was threatened and severely beaten during those interrogations, but all that was denied by the police. No one, however, denied defendant's testimony that, after he had been ordered committed as a material witness, he was refused, by the police, permission to consult an attorney whose name had been given him by the Judge.

Despite all this, the Trial Judge in his charge never mentioned the right of defendant to a prompt arraignment on arrest, and never informed the jury that any illegal detention, if proven to the jury's satisfaction, was a factor to be considered by the jury in coming to its decision as to whether or not defendant's confession was voluntary. Worse than that, the trial court refused defense counsel's request that the jury's attention be called to section 165 of the Code of Criminal Procedure, which requires that a defendant must in all cases be taken before a magistrate without unnecessary delay, the court refusing also the associated request that the jury be told of its right, in determining the question as to voluntariness of confession, to consider defendant's detention before confession and any unnecessary delay in his arraignment. By that failure to charge and those refusals to charge, the jury was left completely ignorant of the settled law that any illegal withholding of arraignment is a sufficient basis for the throwing out, by a jury, of a confession obtained during such illegal imprisonment, as involuntary.

Indeed, the Trial Judge, in denying the request above referred to, inquired of counsel, in the jury's presence: '' According to the testimony in this case the defendant was arraigned almost immediately after he made his confession, wasn't he? '' If it is now to be the law that the statutory requirement of arraignment *promptly after arrest* is satisfied by arraignment *promptly after confession,* then the police have acquired the right to question a citizen, without bringing him before a magistrate, for any length of time necessary to wring from him an acknowledgment of guilt. The statute itself, as well as the decisions of this court, from *People* v. *Rogers* (18 N. Y. 9) down to *People* v. *Valletutti* (297 N. Y. 226), is directly to the contrary of that.

Perhaps the trial court, by its question above quoted, meant to say or suggest that, since defendant was being held as a mate-

rial witness, and since such holding was under a court order and therefore legal, he could be questioned at will until he should break down and admit the crime. It is strange doctrine that a material-witness commitment, intended only to guarantee the presence of a witness at the trial, takes away from the " witness " all protection against third-degree questioning, as a suspect, and allows the police to hold him incommunicado, and deny him access to an attorney already assigned to him by a court. If this simple device, of treating an arrested person as a " material witness ", legalizes any subsequent period of otherwise unlawful detention, it will indeed be a useful one for those who are impatient of the curbs of section 165.

This defendant was, as his own experienced counsel said in his summation speech, " covered all over with the leprosy of crime ", but it is a wretch like that who needs these law guaranties of which we so often boast. It will be a bad day when the police become the judges as to who is, and who is not, entitled to those ancient rights.

Of course, it is almost an absurdity and a contradiction in terms to say that a confession obtained after a week of close, hard questioning is " voluntary ". But it is the law of this State, despite sections 165 and 395 of the Code of Criminal Procedure, and section 1844 of the Penal Law, that the jury may hold to be " voluntary," admissions so obtained. Since delay and illegal detention do not in themselves invalidate extrajudicial admissions, the only protection left to a defendant who claims, as this defendant did, that he has been illegally held for the purpose of extorting a confession, is such a charge by the court as was requested here, and refused. Thus the charge here was plainly erroneous, and it should not be necessary to argue that the error was no slight or technical one (see Judge LEHMAN's famous words in *People* v. *Mummiani*, 258 N. Y. 394, 399, 400).

Believing as we do that this major error of law requires a reversal, we do not comment on the other points raised by defendant.

The judgment should be reversed and a new trial ordered.

LEWIS, CONWAY, DYE and FULD, JJ., concur with BROMLEY, J.; DESMOND, J., dissents in opinion in which LOUGHRAN, Ch. J., concurs.

Judgment of conviction affirmed. [See 300 N. Y. 647, 715.]