Fboessel, J.
Defendant, 33 years old, has been convicted of murder in the first degree and sentenced to death. His conviction rests largely on certain inculpatory admissions which he made to the police during the course of their investigation of the homicide. It is contended on this appeal that the judgment of conviction should be reversed on the grounds, among others, that the inculpatory admissions were involuntarily made and were untrue; that their admission in evidence violated defendant’s rights under the Fourteenth Amendment of the United States Constitution; that the trial court erred in failing to charge that defendant’s arraignment was illegally delayed; and that the jury’s finding of guilt is against the weight of the evidence. The factual background and circumstances of this homicide, and the events which led to defendant’s inculpatory statements to the police, are as follows:
The victim of this homicide was a 16-year-old girl, one Lillian Mojica. She died of strangulation but had also been raped, her scalp lacerated and her body scorched by fire. Her 15-year-old brother, Eichard, discovered the body beneath a mattress in the basement of their home, located at West 187th Street in Manhattan, shortly after 3:00 p.m. on February 13,1958.
At the time of the homicide, defendant was a roomer in the Mojica house. He worked as an assistant cook at the Jewish Memorial Hospital nearby on West 190th Street, which was 10 to 15 minutes’ walking distance from the Mojica house. It is undisputed that, when Eichard Mojica departed for school at 6:15 a.m. on the day of the murder, defendant was alone in the Mojica house with Lillian. She had locked the door as Eichard left. Defendant was not seen that morning until about 9 o’clock when he appeared at the Jewish Memorial Hospital. That day, Thursday, was defendant’s day off from work. He claimed to have received a telephone call before going to the hospital, in which the caller — without asking his name or identifying herself — merely directed him to “ Eeport to work ” and hung up the transmitter. Upon his arrival at the hospital, defendant *559 was told that he had not been sent for. He thereupon went to a nearby bank to cash a check, and thence traveled to downtown Manhattan to visit his wife, from whom he was separated.
When defendant returned to the Mojica housp at about 5 o’clock that afternoon, the police were at the scene. Between 6:00 and 7:00 p.m. the members of the Mojica household — including defendant and two other roomers — and a number of Lillian’s acquaintances from the neighborhood were taken to the police station for questioning. These various people were seated in a large “ squad room ” on the second floor of the police station and were interrogated individually. Immediately adjacent to the squad room was a small room formed hy metal partitions. That room was the office of Lieutenant Robb, who supervised the investigation, in which subsequent interrogations of defendant and others took place. The questioning of the numerous people brought to the station house continued until 4:00 a.m. on February 14th, at which time the first phase of the police investigation of the instant homicide was concluded.
Defendant was questioned for the first time, and briefly, about two hours after his arrival at the police station. He told of the telephone call directing him to report for work. Following his statement, defendant was placed in the main squad room with the other persons awaiting interrogation. Between 10:00 and 11:00 p.m., three police officers returned to the Mojica house and searched defendant’s room. They found among his clothing a bathrobe with a bloodstain on the sleeve. The robe was taken to the police station, along with some other articles of clothing, and defendant was interrogated for the second time. This was about midnight. Defendant attributed the bloodstain to the fact that he frequently cut himself shaving. He had a bad acne condition. He also repeated the episode of the mysterious telephone call, stating that he received it at about 6:30 a.m. and arrived at the hospital at 7:00 a.m. This second interview by the police lasted from about an hour to an hour and a half, ending at approximately 1:00 a.m., at which time defendant returned to the squad room. According to Mrs. Mojica, he talked with her at about 3:00 a.m., and, after she told him the police were taking fingerprints ‘‘ inch by inch ’ ’, defendant replied that his fingerprints were “ over all the house ”, and added “I’m not going to confetif anything.”
*560 At 4:00 a.m. Mrs. Mojica, her son Richard and defendant’s half brother (Aponte) left the police station. Defendant remained in the main squad room and, commencing at about 5:00 a.m., Detective Waldron spoke with him generally until about 8:00 a.m. During this period, Waldron brought some coffee and pastry for defendant. In the meantime, the police had planned to check on his statements, and make a more complete examination of his room in daylight.
At about 10:00 a.m. that day, February 14th, two detectives went to the Jewish Memorial Hospital in order to ascertain the time at which defendant arrived there on the previous day; and, at the same time, Lieutenant Robb, accompanied by another police officer, returned to the Mojica house to conduct a more careful search of the premises. At the hospital, it was definitely learned that defendant had not arrived there until 9:00 a.m. on February 13th — as opposed to 7 :'00 a.m. as claimed by him. At the Mojica house, additional bloodstains were discovered in defendant’s room, on the floor and on the soles of a pair of damp slippers found underneath defendant’s bed. A further bloodstain was subsequently discovered on defendant’s bedspread.
Upon discovering the bloodstains, Lieutenant Robb returned to the station house, arriving there at about 11:30 a.m. Defendant was then sitting in the squad room, and Robb asked him to come into his office. Robb ordered a sandwich and coffee for defendant, which he ate, and then conferred with defendant alone. He told defendant at that, time that the police had found bloodstains in his bedroom and blood on his bathrobe, and that it would be better for him if he would tell ‘ ‘ in his own version what happened ’ ’. Robb further told him ‘ ‘ it could have been an accident, it might have happened to me or anyone ”, and urged him to “ get it off ” his “chest ”. After a pause, defendant said: “I pushed her”; and related in substance the following events.
On the previous morning, February 13th, defendant saw Lillian standing in the bathroom combing her hair. The bathroom was located on the second floor of the house, adjacent to defendant’s room. Defendant became “excited”, entered the bathroom through the open door and pushed her. She fell and her head started to bleed. Defendant then went to his bedroom to “ think ”. He explained that he had blood on his hands and *561 perhaps on his shoes at the time. This, according to defendant, accounted for the bloodstains on the floor of his room; and, as for the stains on his bathrobe, defendant stated: “ I might have touched it when I went into the bedroom.” Defendant then returned to the bathroom and dragged the girl down to the cellar, where he burned her clothes with matches.
When defendant concluded the foregoing statement, Lieutenant Robb called two other police officers into his office. Defendant repeated his original statement made to Robb and added some details, including the fact that he had raped the girl. Defendant denied strangling her, and declined to admit dragging her to the rear of the cellar where she was eventually found by her brother. He maintained that he left her at the foot of the cellar stairs. After having thus enlarged upon his first statement to Robb, defendant lowered himself to the floor at the request of the detectives present and demonstrated how he raped the deceased.
At about this time defendant’s wife was in the squad room of the police station, having been brought there by the police. Defendant was permitted to speak to her. According to her testimony, defendant entered the squad room, embraced her, and protested:6 ‘ These people are trying to blame on me a crime that I did not commit.” Defendant was crying, she said, and told her that the police put a gun in his chest. She asked him what was wrong with his head, having apparently noticed what she described as an indication of a “ beating ’ ’ on his forehead. When asked by counsel for the defense whether this mark on his forehead was bleeding, Mrs. Vargas replied “ Not too much ”.
After this alleged conversation with Mrs. Vargas, and at about 1:30 p.m., the police took defendant back to the Mojica house, where he re-enacted the events previously described to them. Defendant was then returned to the station house and sat on one of the desks. The police brought him a sandwich and coffee. At about 4:30 p.m. two Assistant District Attorneys arrived, and at 6:00 p.m. one of them took a statement from defendant which was recorded by a stenographer. During this interrogation defendant repudiated, in substance, his earlier admissions to the police. His frequent retort was that he was confused and nervous. In response to certain questions with regard to the admissions, defendant admitted making the state *562 ments but asserted that they were not true. He maintained that the police had told him what to say, and that he was struck.
Following the interview by the Assistant District Attorney, defendant was booked and taken downtown to the 30th Precinct station house at 152nd Street for overnight detention. On Saturday morning, February 15th, he was taken to the police 1 ‘ lineup ’ ’ and photographed. From there defendant was taken to the District Attorney’s office where he was briefly interrogated by an Assistant District Attorney, but this interrogation was of no consequence. Then at about 11:00 a.m. defendant was arraigned in the Felony Court.
Defendant’s position, while testifying at the trial, was similar to that taken when interrogated by the Assistant District Attorney on Friday, February 14th. Concerning the treatment he allegedly received at the hands of the police, however, defendant greatly elaborated upon the declarations which he made to the Assistant District Attorney; and he was more emphatic in asserting his innocence. Defendant claimed that, commencing with the latter part of the evening of February 13th, he was subjected to violent beatings and cursing by the police. These beatings, according to defendant, continued at intervals through the afternoon of Friday, February 14th.
Defendant testified that he was screaming and, on one occasion specifically, was crying. The last session which he described allegedly took place for five continuous hours, starting at 7 o’clock Friday morning; this the police emphatically denied. That session, he testified, was culminated by a kick in the forehead, allegedly inflicted by one of the police officers.
It may be noted that no objection was made to the introduction of the admissions nor was any voir dire requested to probe the question of voluntariness. On the issue of the voluntariness of the inculpatory admissions, the credibility of the defendant was squarely pitted against that of the police officers. Simply put, defendant testified that he was beaten and forced to inculpate himself, whereas the police officers testified that this was not so. The police officers who were principally involved in the investigation of the homicide categorically denied beating or threatening the defendant, and, in addition, maintained that they did not see anyone else strike him.
*563 This issue was properly submitted to the jury for their determination. Their function was explained at length by the Trial Judge in his charge; and the court, being mindful of the crucial nature of the testimony of the police officers in this case, took pains to stress that their statements on the stand were to be evaluated in the same manner as those of any other witness — “in the light” of the jury’s “ experience and common sense, with a view to determining whether * * * [they] had a motive or an interest to speak other than the truth ”.
The law which controls the admissibility in evidence of inculpatory statements was competently discussed by the Trial Judge. “ [Statements made under the influence of fear produced by threats, mistreatment, violence, duress or coercion of any kind, mental or physical, would not be voluntary.” The jury was instructed, in fact, that if they were not ‘ ‘ satisfied beyond a reasonable doubt that the admissions testified to ” by the police ‘ ‘ were in fact made by the defendant, or were voluntarily made, ” or if they were not ‘ ‘ satisfied that the admissions were true ”, they “ must acquit ” the defendant (emphasis supplied).
The jury’s determination of the issue of fact thus presented to them was adverse to the defendant. Their adverse determination cannot be disturbed ‘‘ without breaking down the barriers that separate the functions of a jury from those of an appellate court” (People v. Arata, 255 N. Y. 374, 375; People v. Lytton, 257 N. Y. 310, 312-313; People v. Perez, 300 N. Y. 208, 216; see, also, People v. Peller, 291 N. Y. 438, 446). Nor can it be said that defendant’s rights under the Fourteenth Amendment have been violated.
We have examined the record before us “ with the patient care exacted by the life that is at stake ” (People v. Lytton, supra, p. 313), and note that the evidence given by the police at the trial, which the jury chose to believe, gains credence and support when one objectively considers the circumstances and environs in which the alleged beatings depicted by defendant took place. The interrogations of defendant all took place in Eobb’s office, except the interrogation from 5:00 to 8:00 a.m. by Waldron, the latter having taken place in the main squad room. Eobb’s office, it will be recalled, was located immediately adjacent to the main squad room on the second floor of the police station. The walls of this office Avhich separated it from the squad room Avrere of *564 metal partitions. Under such circumstances, any physical violence by the police, and the resulting manifestations of pain, such as screaming, on the part of defendant, would have been audible to the many people sitting in the adjacent squad room throughout the evening and early morning of the 13th and 14th. Defendant’s own half brother, Aponte, was in the squad room until 4:00 a.m. on February 14th. Certainly, if defendant had been screaming, as he claimed he was, Aponte would not have testified that as far as he knew his brother was “ well treated ” by the police. A photograph of defendant, offered in evidence and taken at about 5:00 a.m. by a newspaper photographer in the squad room, shows him. placidly seated, dressed in a winter overcoat. The photographer testified that he did not hear any screams nor did he see anyone being struck.
Defendant was not denied any right of communication. He was not isolated, nor interrogated for long periods of time. While he was not furnished a bed for sleep during the intervals between interrogations, he was permitted to sit, unmolested, in the main squad room. He was also supplied with food.
There are only two items of objective evidence in this record which, standing alone, could possibly indicate that defendant was struck. There is in evidence a photograph showing a slight mark on the forehead above defendant’s right eye, and there is evidence that defendant had a scar on his back which at the time of the trial was stipulated to have been from six months to two years old.
The photograph which shows the mark over his right eye was taken by the police on Saturday, February 15th. It was defendant’s contention that this mark was a .cut, and that it resulted from the kick which he allegedly received from the police officer. This was the mark to which Mrs. Vargas alluded in her testimony. There was an abundance of testimony given at the trial, however, to conclusively refute defendant’s and his wife’s testimony in this regard.
During the afternoon of Friday the 14th, defendant was noticed rubbing his forehead with the hem of a handkerchief and with his finger, as though he were picking a pimple. At 5 o’clock on that afternoon, a reporter testified, he observed some scratched pimples on defendant’s forehead and face. When shown the police photograph of defendant, the reporter stated *565 that when he saw defendant the mark was “ definitely not that pronounced ’ ’.
This rubbing by defendant continued during the interrogation by Assistant District Attorney Herman on Friday evening. Reference to the rubbing, in fact, appears in the stenographic transcript taken at that time. Mr. Herman testified at the trial, and, when asked by defense counsel whether defendant was “ deliberately trying to build up an injury ”, replied that “ he was enlarging on something which might have been originally a pimple or a slight scratch and was trying to make it bigger.” With regard to the scar on defendant’s back, the period during which it could have been inflicted is too broad to lend any significance to it. As already noted, it was stipulated at the trial, about 10 months after defendant was interrogated by the police, that the scar could have been anywhere from six months to two years old. The physician from the City Prison who examined defendant there on February 15, 1958 testified that he noticed only a very extensive acne condition on defendant’s back; and defendant when asked by the physician whether he had any complaints stated that he had not.
We turn now to the question of delay in arraignment. The Trial Judge presented this issue to the jury for their determination as a question of fact. It is contended that reversible error was’committed since the trial court should have charged that the delay in arraignment of the defendant was “ unnecessary ” as a matter of law (Code Grim. Pro., § 165).
At the very outset, we need only point out, aside from the fact that no exception was taken to the charge on that ground — which of course in a capital case is not conclusive upon this court — one of defendant’s written requests was an instruction that the court leave this matter to the jury as a factual question. The court refused to charge this request only because it was “ adequately covered in the charge ”. Under these circumstances, defendant has no cause for complaint (see People v. Higgins, 5 N Y 2d 607, 629, 635). At all events, we are of the opinion that failure of the trial court to charge in a manner as now urged on this appeal did not constitute reversible error.
In a proper case, of course, a defendant is entitled to the charge that his arraignment was unnecessarily delayed as a matter of law. Even then, illegal delay is but one circumstance to *566 be considered along with any other evidence bearing on the question of the voluntary character of the admissions. Under all the circumstances of this case — especially in light of the fact that defendant could not have been arraigned before the morning of February 14th, when the Felony Court opened — it could hardly be claimed that a delay in arraignment until the afternoon of that day would have been unnecessary and unreasonable as a matter of law. The period of delay which continued thereafter until the actual time of defendant’s arraignment during the next morning was unreasonable as a matter of law.
However, this latter period of delay had absolutely no bearing upon the voluntariness of defendant’s admissions to the police. As the Supreme Court stated in United, States v. Mitchell (322 U. S. 65, 70), the “ illegality ” of that period of delay did not “ retroactively change the circumstances under which he made the disclosures ”. The crucial period in this case as to the alleged illegal delay in arraignment which might bear on the voluntariness of defendant’s admissions extends from the earliest time he could have been arraigned — on the morning of the 14th — to the afternoon of that day. Even though the court in its charge lumped the two periods together and did not charge that the subsequent period was one of illegal delay, no reversible error is here present, since, as we have indicated, the delay which took place during the subsequent period (until the next day) had absolutely no bearing on the voluntariness of defendant’s admissions.
In answer to defendant’s third contention on this appeal, we are satisfied that defendant’s guilt was established beyond a reasonable doubt. In addition to defendant’s inculpatory admissions and the presence of bloodstains in his room and on his clothing, there was additional evidence in this record for the jury to consider in connecting defendant with the crime. There is the matter of a metal signet ring belonging to the brother Richard, which was found adhering to the neck of the deceased girl. The brother testified that only he and the defendant knew that this ring was kept in a certain box in the brother’s bureau drawer. There was also evidence that defendant knew that certain keys to the Mojica house, taken at the time of the homicide, were missing, although allegedly never told of their absence.
*567 There was further evidence tending to show that the girl was killed well before 9:00 a.m. when defendant arrived at the hospital, thus affording him ample time to commit the crime during the period from 6:15 a.m. when he was left alone with the girl in the house. Relative to the time of death, a neighbor of the Mojicas testified at the trial that she smelled burning cloth between 7:10 and 7:20 o ’clock on the morning of February 13th; and, in addition, a zippered outer jacket which the girl wore to school — she customarily left between 7:00 and 7:30 a.m. — was found on the body. This latter proof is to be contrasted with the wholly indefinite medical proof as to the time of death.
Defendant contends that, in light of certain allegedly ‘ ‘ white ’ ’ hairs found by the medical examiner on the hand of the deceased girl, she was murdered by an outside white-haired assailant. The medical examiner’s testimony as to the hair was most inconclusive and was in fact substantially refuted. These hairs only “ appeared like ” white hairs in a poorly illuminated basement. The medical examiner’s assistant testified that he was given only a “hair” — as opposed to several — by the medical examiner. In addition, the laboratory man who examined the hair under a microscope testified that it was brown, not white. At all events, this alleged white hair was not found underneath the girl’s fingernails, which fact might have betokened a struggle, but was rather ‘1 adhering ’ ’ to her fingers. It is conceivable, in light of defendant’s admissions, that the hair came in contact with her fingers and “ adhered ” to them as she lay on the bathroom floor, or during the course of her being dragged down the carpeted stairs to the cellar, or while covered with the old mattress.
The jury had a right to find that defendant’s claim about the early morning mysterious telephone call was false ,• that defendant’s explanation of the bloodstains as having been caused by shaving was likewise false; that he felled the deceased, thereby causing the laceration on her head; that he raped the deceased, with the consequences described by the medical examiner; that he dragged her downstairs causing contusions and abrasions to her protruded tongue and a discoloration over the bridge of her nose — as described by the medical examiner; that he set fire to her clothing, causing her to be burned; and that his admissions to the police were voluntary and true. On the basis of all of the *568 evidence, the jury had the right to find beyond a reasonable doubt that this defendant strangled the deceased and thereby murdered her.
We have examined the several additional points argued by defendant on this appeal, and find that they are without substance.
Accordingly, the judgment appealed, from should be affirmed.
Chief Judge Desmond and Judges Dye, Fuld, Van Voorhis, Burke and Foster concur.
Judgment of conviction affirmed.