UNITED STATES ex rel. Charles GLIN-
TON, Petitioner,

v.

Wilfred L. DENNO, Warden of Sing Sing Prison, and The People of the State of New York, Respondents.

United States District Court
S. D. New York.

Jan. 3, 1962.

Nancy Carley, Jackson Heights, N. Y., for petitioner.

Frank S. Hogan, Dist. Atty., New York City (Peter R. Rosenblatt, Asst. Dist. Atty., New York City, of counsel). for respondents.

THOMAS F. MURPHY, District Judge.

Petitioner was convicted of premeditated murder in the Court of General Sessions, New York, on April 16, 1959. He thereafter unsuccessfully appealed his conviction to the highest court of that state (People v. Glinton, 8 N.Y.2d 742,

201 N.Y.S.2d 336, 167 N.E.2d 741 (1960)) remittitur amended (People v. Glinton, 8 N.Y.2d 849, 203 N.Y.S.2d 898, 168 N.E.2d 704). Thereafter the Supreme Court denied certiorari (Glinton v. People of State of New York, 364 U.S. 853, 81 S.Ct. 96, 5 L.Ed.2d 77).

Petitioner had two trials. At the first he testified in his own defense, and a mistrial was declared when the jury could not agree. At the second trial he did not testify and was convicted. At no time, either prior to trial or at trial, did he make any admission or confession of guilt.

In this court he seeks a writ of habeas corpus [1] alleging that certain exculpatory statements made by him while being held as a material witness and used in evidence against him violated his constitutional right of due process. The same argument was presented to the New York Court of Appeals and to the Supreme Court.

Early on September 13, 1957, a cruel and sudden death came to an unsuspecting homosexual, Jose Rivera. It was overwhelmingly established on trial that the petitioner, Rivera's homosexual "husband," threw him out of a window of the Hotel Marie Antoinette and subsequently identified the broken body as that of his brother, Howard Glinton. Further inquiry ceased and the case was closed by the police as one of suicide.

The murder was solved and the petitioner booked for the homicide only after the following had transpired.

On November 10, 1957, the police got information from one Fleming that the deceased was not Howard Glinton, the brother of petitioner, but was Jose Rivera, also that petitioner had previously asked Fleming to kill Rivera so that he (the petitioner) could collect insurance he had taken out on Rivera. On that date Detective Demas spoke to the petitioner after he had been arrested on another charge about his whereabouts on the evening of September 12–13, and whether the deceased was in fact his brother. The petitioner told the detective that the deceased was his brother, Howard, and on the evening of September 12–13 petitioner had gone to the movies with Julio Carlo, and that when they returned to the hotel they learned of the suicide. On this date Carlo could not be found.

On November 13th after the petitioner was released on the other charge he was held as a material witness by a judge of the Court of General Sessions in New York County. On his arraignment in the judge's chambers the judge told the petitioner that if he was in fact a witness he should cooperate, but if he was in fact a suspect he was cautioned not to talk to anyone. At the same time petitioner's attorney, Robert Ross, was telephoned and advised of the arraignment.

The next day, November 14th, petitioner, with his attorney Mr. Ross present, was again arraigned in General Sessions as a material witness and committed for lack of bail. Mr. Ross testified that he told the petitioner not to speak to the district attorney. On the same day Fleming was also arraigned as a material witness and a grand jury investigation commenced by the service of a subpoena on Detective McDonald, who testified before the grand jury on November 14th.[2]

On November 15th the district attorney, with Detective Demas present, took a question and answer statement from petitioner, at which time the petitioner was perfectly normal and not intoxicated, as he testified at the hearing before us, and on this day he told the district attorney the same story that he had told Detective Demas on November 10th, viz., that he had been with Julio Carlo on the evening of the death of his "brother" and that the deceased was in fact his brother.

---

1. The writ was dismissed by Judge Herlands without a hearing but on appeal that dismissal was reversed and remanded. 291 F.2d 541 (2d Cir., 1961).

2. This grand jury expired on November 30, 1957.

On November 25th, after some necessary investigation, Detective Demas confronted the petitioner with the results and he admitted that the deceased was not his brother, but reiterated that he and Julio Carlo had gone to the movies on the night in question.

On November 29th petitioner was confronted by a witness named McCloney who told petitioner that he had seen him in the lobby of the hotel on the evening of September 13th just before the body was discovered.

On December 3rd Detective Demas told petitioner that the clerk at the hotel had told him that Julio Carlo had told the clerk that he had seen the petitioner and another colored follow named Rocky or Jimmy in the apartment that night. Julio Carlo was still missing as of this date.

On December 10th petitioner told the detective and the district attorney that he wanted to tell the truth and that his first story was a lie about going to the movies with Carlo and coming back and finding the police. He now said he did go to the movies with Carlo but Carlo somehow disappeared and he came back to the hotel alone and as he was opening the door of his apartment Carlo came out and said, "Let's get out of here, the plan backfired." Carlo also said, according to petitioner, that there had been a fight among Carlo, Flores (a former "lover" of petitioner's) and the deceased involving a plot to kill the petitioner. In this fight the deceased had said that he was going to the police, so Carlo and Flores threw the deceased out the window.

The police picked up Carlo on December 17th and on December 26th the police confronted petitioner with Carlo.

On December 26th the petitioner made his third statement to Detective Demas and the district attorney. At this time he said that he wanted to tell the truth and that the colored fellow was Lester Pierce and that on the night of September 12–13 petitioner had taken a walk and met Pierce and came back to the

apartment with him. There he and Pierce saw the deceased on the sofa holding his head between his knees and suddenly they saw the deceased fall out the window. They became frightened and when they left the room they met Carlo. Carlo was held as a material witness on December 26th.

On January 14th the police arrested Lester Pierce. Pierce confronted the petitioner and told petitioner what he said he saw happen; nevertheless petitioner reaffirmed his third version. On that day, January 14th, petitioner was discharged as a material witness and booked for homicide.

It is petitioner's claim that after he was arraigned as a material witness he was taken out of the City Prison 13 or 14 times by Detective Demas and brought to a nearby restaurant where he was plied with drink, usually 13 or 14 "double shots" at a sitting, and that each time he talked to the detective or the district attorney he was under the influence of liquor and continuously asked that his lawyer be present and insisted that he did not want to talk unless his lawyer was present. He also vaguely testified to some threats by a Deputy Police Commissioner.

■ We reject such testimony and find that the petitioner is unworthy of belief. We find as a fact that he was taken to a nearby restaurant seven or eight times by Detective Demas for food but at no time was he furnished any intoxicating liquor. We find that the reason he was taken to a restaurant and not back to the Tombs was because he had missed his regular meal hours and if he was returned to the Tombs would not have been given any food. We find as a further fact that each time he talked to the district attorney and the detective he did not ask for his lawyer and that he was told that he did not have to say anything and that anything that he did say could be used against him. We find that no threats were made and no Deputy Police Commissioner was ever present. Petitioner chose, however, to make the three exculpatory statements thinking perhaps

he could not only outwit the police but collect the $10,000 of insurance.

It is petitioner's contention that the introduction into evidence of his exculpatory statements through the witness Demas was in violation of his constitutional right of due process and that his conviction was thereby tainted with fundamental unfairness. The argument is that, although not perhaps at the outset, but certainly from December 1, 1957, on, he was illegally held in prison as a material witness, and the questioning of him in the absence of his attorney during that illegal detention was inherently coercive and his statements involuntary. It is also argued that from December 1st on The People had sufficient evidence to indict petitioner and chose to postpone such indictment so as not to be hampered by the constitutional safeguards provided persons charge with crime. Cf. People v. Di Biasi, 7 N.Y.2d 544, 200 N.Y.S.2d 21, 166 N.E.2d 825 (1960).

■ There is no doubt in our mind that Demas' testimony with respect to petitioner's shifting and inconsistent explanations was prejudicial to him, in the sense that any incriminating evidence is prejudicial, and the prosecutor apparently exploited this testimony in summation with adroitness. We find nothing unfair in the use of petitioner's statements, however. We find that he was lawfully committed, *bona fide,* as a material witness, and not as a ruse to extract a confession from him, and we find that his statements were voluntarily made and not as the result of coercion of any kind, including intoxicating drink. Petitioner was not denied any constitutional rights in being questioned in the absence of his attorney. He was fully advised by judge and counsel not to speak and by the district attorney that he did not have to speak if he did not want to, and he chose instead to make what he thought were plausible explanations, thinking himself equal to the task, to his detriment. Cf. United States v. Vita, 294 F.2d 524, 529 (2d Cir., 1961).

We reject petitioner's testimony that Detective Demas plied him with drink and find that at no time while in the custody of Detective Demas was any spiritous liquor given to petitioner.

The contention that his detention after November 30th was illegal is predicated upon the fact that the investigation into the homicide of Rivera was at that time withdrawn from the grand jury and that there was then no proceeding pending as required by § 618–b of the New York Code of Criminal Procedure to continue holding him as a material witness.

■ Even if we assume that his continued detention was violative of that statute it does not necessarily follow that his statements were therefore any the less voluntary, and in the final analysis that remains the ultimate test, viz., one of voluntariness, as the authorities relied upon by petitioner show, see e. g., Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037, to be determined in the light of the peculiar facts of the individual case. Here the initial alibi story of petitioner given to Demas on November 10, 1957, is unassailable; the changed and conflicting versions given thereafter were the result of new facts and witnesses turned up through the efficient investigation by the prosecution with which petitioner was confronted; his questioning was not conducted through long and wearying hours, and no threats or force of any kind were employed and even assuming his request that his attorney be present while he was questioned was denied his right to remain silent was clearly understood by him. There is no credible basis in the record before us to warrant the conclusion on our part that petitioner's responses to questions and his statements were the product of his will being importuned, but on the contrary we find that they resulted from "an essentially free and unconstrained choice" by petitioner. Culombe v. Connecticut, supra.

As to whether or not the district attorney had sufficient evidence to indict him before December 10th or the 26th, the dates of his second and third versions of the occurrences of the fatal night, we

think it a debatable question at the very least. Under all the circumstances we conclude that petitioner's trial and conviction involved no violation of his constitutional rights and that the writ must accordingly be, and hereby is, dismissed.

This is an order. No settlement is necessary.