**UNITED STATES of America ex rel. Charles GLINTON, Relator-Appellant,**

v.

**Wilfred L. DENNO, as Warden of Sing Sing Prison, Ossining, New York, Respondent-Appellee.**

**No. 439, Docket 28654.**

United States Court of Appeals Second Circuit.

Argued April 28, 1964.

Decided Dec. 4, 1964.

Roger W. Langsdorf, New York City, for relator-appellant.

Michael Juviler, Asst. Dist. Atty., New York County, New York City (Frank S. Hogan, Dist. Atty., and H. Richard Uviller, Asst. Dist. Atty., on the brief), for respondent-appellee.

Before LUMBARD, Chief Judge, and MOORE and SMITH, Circuit Judges.

MOORE, Circuit Judge:

This is an appeal from an order of the United States District Court for the Southern District of New York dismissing a petition for a writ of habeas corpus, and vacating a previous order staying execution of petitioner's sentence of death.

After a jury, in the former Court of General Sessions of New York County, found him guilty of first degree murder, the relator, Glinton, was sentenced to death. The conviction was unanimously affirmed by the New York Court of Appeals. People v. Glinton, 8 N.Y.2d 742, 201 N.Y.S.2d 336, 167 N.E.2d 741, remittitur amended, 8 N.Y.2d 849, 203 N.Y.S.2d 898, 168 N.E.2d 704 (1960), cert. denied, 364 U.S. 853, 81 S.Ct. 96, 5 L.Ed.2d 77 (1960).

This is the third time that relator seeks relief in this Court. In June, 1961, we reversed a denial of habeas corpus and remanded for an evidentiary hearing "as to all the facts and circumstances relating to relator's detention [as a material witness] and the statements obtained during that period." 2 Cir., 291 F.2d 541, 542 (1961).

After the hearing, at which relator, represented by counsel, testified at length, the district court found that relator "was lawfully committed, bona fide, as a material witness, and not as a ruse to extract a confession from him, * * * that his statements were voluntarily made and not as the result of coercion of any kind, * * * [that] he was fully advised by judge and counsel not to speak * * *, and [that] he chose instead to make what he thought were plausible explanations, thinking himself equal to the task, to his detriment." D.C., 200 F.Supp. 643, 646 (1962). The Court further found that, "At no time, either prior to trial or at trial, did he [relator] make any admission or confession of guilt." Id. at 644. The Court concluded "that the petitioner is unworthy of belief" and "that petitioner's trial and conviction involved no violation of his constitutional rights. * * *" Id. at 647.

The District Court denied the writ. 200 F.Supp. 643 (1962), and we affirmed the denial. 2 Cir., 309 F.2d 543 (1962), cert. denied, 372 U.S. 938, 83 S.Ct. 886, 9 L.Ed.2d 769 (1963).

The facts of the case are as follows:

Glinton and the deceased, Rivera, lived together in a hotel in New York City. Representing themselves as brothers, each took out insurance on the other's life. In September, 1957, the deceased was found lying on the sidewalk below his hotel window; he died there a few minutes later as a result of injuries sustained in falling the five floors from his hotel room.

Two hours afterwards, Glinton returned to the hotel and identified the deceased as his brother. The identification was supported by a wallet found at the scene. After further police investigation, the matter was closed. The insurance company agreed to pay Glinton the insurance benefits.

It was not until November 9, 1957, that the case was reopened. On that day, one William Fleming, prompted by the possibility of receiving a reward, went to the police. He said that the deceased was not Glinton's brother; and that Glinton, aware of Fleming's criminal record and experience as a "mugger," had asked Fleming's assistance in a plot to kill Rivera.

The police thereupon arrested Glinton and booked him for consorting with a known criminal for an unlawful purpose. N.Y. Penal Law, McKinney's Consol.Laws, c. 40, § 722(11).

On November 13, Glinton appeared in Court with his attorney. The judge dismissed the consorting charge. Thereafter, Glinton was driven, with the consent of his attorney, to the District Attorney's Office. There he voluntarily and freely repeated the alibi story he had previously told the police at the time of the November 9 arrest; namely that the deceased was his brother Howard, that he, Glinton, on the night of the "acci-

dent" had gone to the movies with a friend, Julio Carlo, and that upon their return to the hotel they learned of the "suicide."

That afternoon a grand jury proceeding inquiring into the death of Rivera was commenced. Glinton was logically considered to be an important witness. He was taken before a judge and ordered to post $10,000 bond as a material witness. N.Y.Code Crim.Proc. § 618–b. Glinton's attorney was immediately called. The judge cautioned Glinton not to say anything to the police if he thought he was a suspect.

The next day, with his lawyer present, Glinton was arraigned as a material witness and committed to the City Jail for lack of bail. N.Y.Code Crim.Proc. § 618–b. The lawyer told Glinton not to say anything to the police unless he, the lawyer, was present.

During the rest of November, the grand jury proceeded with its investigation. Subpoenas were served on three witnesses. The informer Fleming was held as a material witness. Testimony was taken from a police detective. A search for Carlo, Glinton's alibi witness, was initiated.

On two later occasions during the month of November, Glinton was interviewed by an assistant district attorney. Despite his own attorney's advice, Glinton talked freely. He admitted that Rivera was not his brother, but reiterated that he and Carlo had gone to the movies.

Carlo had not yet been located, and on November 30, 1957, the case was withdrawn from the grand jury. Glinton, however, remained in custody while the police continued to conduct their own investigation into Rivera's death.

On December 10, 1957, Glinton told a detective and a district attorney that he wanted to tell the truth, that his first story had been a lie. Oblivious to the advice of both his attorney and the arraigning judge, and never requesting that his attorney be present, Glinton abandoned the original alibi and sought to blame the death on Carlo, the alibi witness. Glinton said that he and Carlo had gone to the movies. Afterwards Carlo disappeared and Glinton returned to to the hotel. Carlo was there. He told Glinton that there had been a fight, and that Rivera had been thrown out of the window.

Carlo was finally located, and in late December Glinton made a third statement. Again he said he wished to tell the truth. His story this time was that on the night of the "accident," while taking a walk, he met a person named Pierce. On their return to the hotel room, they saw Rivera suddenly fall out of the window.

On January 9, 1958, Pierce was found. Glinton was confronted with Pierce on January 14. After reaffirming his third story that the death was a suicide, Glinton was, on the same day, booked for homicide.

After one trial at which the jury could not agree on a verdict, Glinton was convicted at a second trial. The evidence presented by the state included the stories told by Glinton during his detention as a material witness. These exculpatory statements, each one different from the next, were relied upon by the prosecution as evidence of Glinton's guilty state of mind.

We have no reason to reverse our earlier holding, 309 F.2d 543 (1962), that (1) Glinton's statements were voluntary; (2) his initial commitment, in lieu of bail, on November 13 as a material witness was lawful; and (3) the statements made by Glinton while he was detained as a material witness were properly admitted in evidence.

The record indicates that Glinton's attempts to exculpate himself were entirely voluntary. As Judge Murphy said, Glinton "chose, however, to make three exculpatory statements thinking perhaps he could not only outwit the police but collect the $10,000 of insurance." 200 F.Supp. at 645–646. The interviews were reasonably short and infrequent; Glinton was at all times provided with food and coffee; there is absolutely no indication or allegation of any type of physical

or mental maltreatment. Glinton conferred with retained counsel several times during the detention, although he never requested the presence of counsel at these interviews.

■ There cannot be any doubt that Glinton was validly committed as a material witness. He was certainly an important witness. Glinton had lived with the deceased in the suite from which the fall occurred, had insured his "brother's" life, and had returned to the scene soon after the death.

Additionally, the $10,000 undertaking was reasonable. Glinton had come to New York after a brush with the Florida police. He had no family in the area and no permanent address. His only associates, drifters like himself, were undesirable persons of questionable reputation. Finally, the court's order was based on sworn proof as required by state law. N.Y.Code Crim.Proc. § 618–b.

■ Glinton asserts that it is irrelevant that the police complied with the technicalities of the material witness statute, because as the "target" of the grand jury proceeding he could not have been summoned to testify, People v. Steuding, 6 N.Y.2d 214, 189 N.Y.S.2d 166, 160 N.E.2d 468 (1959), and therefore could not be held as a witness. This argument has no merit. People v. Perez, 300 N.Y. 208, 219, 90 N.E.2d 40, 46

(1949), cert. denied, 338 U.S. 952, 70 S.Ct. 483, 94 L.Ed. 588 (1950), is dispositive of the issue.[1] See also United States v. Scully, 225 F.2d 113 (2d Cir. 1955), cert. denied, 350 U.S. 897, 76 S.Ct. 156, 100 L.Ed. 788 (1955).

Glinton raises two issues on this appeal that were not previously considered by this Court. First, he argues that the arrest for "consorting" was unconstitutional; hence the November 9 statement was inadmissible at trial. The second point is that our previous holding, concerning the admissibility of the statements made subsequent to the discharge of the grand jury, was erroneous in the light of the Wong Sun,[2] Ker,[3] and Traub,[4] cases.

■ The first argument is not supported by the facts. As pointed out above, the police arrested Glinton for consorting with a known criminal for an unlawful purpose.[5] The arrest was not merely an excuse for detaining Glinton in order to question him about the Rivera death. Compare People v. Robinson, 13 N.Y.2d 296, 246 N.Y.S.2d 623, 196 N.E.2d 261 (1963).

■ As for relator's second argument, the cases cited do not alter our previous view that:

" * * * [A]bsent a finding of involuntariness or coercion, * * * federal courts may not upset state

1. In Perez, a murder had been committed during a robbery or burglary. A suspect was caught as he tried to pawn some of the stolen articles. The next day the suspect was committed as a material witness. During his detention he was questioned a number of times; he told conflicting stories. The court said, at page 218 of 300 N.Y., at page 46 of 90 N.E.2d: "While the police may have suspected defendant of the murder, they did not have enough evidence to hold him as a defendant until shortly before he confessed. His detention during this period was lawful because, in light of his admitted knowledge of many of the circumstances surrounding the murder, his commitment as a material witness was valid."

2. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

3. Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

4. Traub v. Connecticut, 374 U.S. 493, 83 S.Ct. 1899, 10 L.Ed.2d 1048 (1963).

5. Glinton asserts that an arrest for consorting is the same as an arrest for vagrancy. This assertion is untenable. While arrests for vagrancy have prompted constitutional inquiries (see, e. g., Douglas, Vagrancy and Arrest on Suspicion, 70 Yale L.J. 1, 6 (1960)), it is apparent that the issue is not raised in the instant case. Glinton was not arrested for having a particular *status*, but rather for engaging in an obvious and clearly defined *act*, that of consorting with a known criminal for the purpose of committing a crime. Such an act being considered criminal in the State of New York, Glinton was properly arrested.

convictions where the only basis for alleging that due process has been violated is the use of statements obtained during an illegal detention." 309 F.2d at 545.

■ The issue here is whether a valid detention under a material witness statute becomes "unreasonable" within the meaning of the Fourth Amendment because the discharge of the grand jury results in a technically illegal detention under state law.[6]

Relevant to the resolution of this question is the fact that the district attorney easily could have preserved the legality of Glinton's detention by keeping the grand jury proceeding alive or by commencing a new one. See concurring opinion of Judge Lumbard in the previous appeal, 309 F.2d at 545. Assuming that Glinton's presence as a material witness was still necessary, this continued detention would not have violated the Fourth Amendment. It cannot seriously be urged, therefore, that a detention which has been proper in all respects becomes violative of the Constitution merely upon a technicality, the discharging of the grand jury.

These conclusions are not changed by the cases cited by Glinton. In Ker, supra, the issue was whether a California arrest violated the Fourth Amendment. In Wong Sun, the issue concerned the admissibility of incriminating statements which were the fruit of an illegal arrest. Moreover, Wong Sun was decided three months before the Supreme Court denied certiorari in Glinton's previous appeal. Finally, the Traub case involved the use of incriminating statements made upon an arrest for breach of the peace. And there it was questionable whether the arrest was legal.

The facts of these cases are sharply distinguishable from the facts of the case at bar. Here Glinton was detained upon the belief that he could contribute material evidence. He was represented by counsel. He knew of his privilege to remain silent, but voluntarily tried to trick and confuse the police with his exculpatory stories. His efforts failed.

No proof or reason has been submitted upon this appeal to cause us to differ with the conclusion of the trial judge who, after seeing and hearing Glinton in an inquiry into all the facts and circumstances surrounding his detention as a material witness, his representation by counsel, and his knowledge of his constitutional rights, said: "There is no credible basis in the record before us to warrant the conclusion on our part that petitioner's responses to questions and his statements were the product of his will being importuned, but on the contrary we find that they resulted from 'an essentially free and unconstrained choice' by petitioner. Culombe v. Connecticut, supra." 200 F.Supp. at 646.

The Court expresses its gratitude to Roger W. Langsdorf, Esq. who ably presented relator's case.

Order affirmed.

6. The material facts of the instant case make it unnecessary to consider whether the introduction of the statements violated the McNabb-Mallory rule. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). The rule is limited to statements obtained in violation of Fed.R.Crim.P. 5(a) which requires that an arrested person be brought "without unnecessary delay before the nearest available commissioner."
Moreover, the Supreme Court has specifically stated that the rule does not apply to the states through the Fourteenth Amendment. Culombe v. Connecticut, 367 U.S. 568, 601, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). See also Ker v. California, supra, 374 U.S. at 31, 83 S.Ct. 1623.